UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WATERMARK SOLID SURFACE, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:07-0993 |
| ) | Judge Echols |
| STA-CARE, INC. ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the Court is Defendant Sta-Care Inc.'s ("Sta-Care's") Motion to Transfer Venue (Docket Entry No. 37). Plaintiff Watermark Solid Surface, Inc. ("Watermark") has responded in opposition to that Motion (Docket Entry No. 42), and Sta-Care has filed a reply (Docket Entry No. 47).

### I. FACTUAL BACKGROUND

This is a diversity action. Plaintiff Watermark is a Tennessee corporation with its principal place of business in Nashville, Tennessee, although, in its Amended Complaint, Watermark states that its "corporate functions . . . were divided between the Plaintiff's Nashville office and Defendant[] Sta-Care's[] office and factory in Wisconsin." (Docket Entry No. 31, ¶ 6). Defendant Sta-Care is a Wisconsin corporation with its principal place of business in Portage, Wisconsin.

The dispute between the parties involves a purported joint venture agreement relating to the design, manufacture, and ownership of molds utilized to manufacture solid surface products for healthcare facilities, such as countertops, sinks, tub surrounds, and shower floors. Watermark concentrates on the sales and marketing of such products, whereas Sta-Care focuses on manufacturing such products for sale to vendors.

In its First Amended Complaint, Watermark claims that it is the creator, designer and owner of certain molds used to manufacture solid surface products for the healthcare industry and has been engaged in supplying solid surface products for the healthcare industry since 2002. For several years, and prior to its entering a joint venture agreement with Sta-Care, Watermark used molds that were manufactured to its specifications in Mexico. Subsequently, Watermark sent the Mexican molds to Sta-Care in Wisconsin in order for its solid surface products to be manufactured by Sta-Care under Watermark's tradenames.

Watermark claims that it delivered approximately 51 molds to Sta-Care and that Sta-Care, under Watermark's directions, created 26 molds for Watermark. Watermark claims that it paid Sta-Care for the molds. Later, the parties agreed to a cost-plus agreement whereby Watermark agreed to pay Sta-Care for the costs of goods and labor plus an administrative fee for manufacturing the molds and products.

Watermark claims it requested Sta-Care to produce 26 wet room floor pans for an existing customer. Sta-Care allegedly refused to produce the floor pans and told Watermark to go elsewhere. Watermark then entered into an agreement with Vendura Industries ("Vendura") in Madison, Wisconsin and asked Sta-Care to turn over the molds. Sta-Care refused to turn over the molds because Watermark allegedly owed Sta-Care for past work. Sta-Care claims that it could not produce the wet room floor pans because its manufacturing facilities were incapable of the production. In any event, the relationship between the parties deteriorated after Sta-Care indicated it would not produce the wet room floor pans.

After Sta-Care refused to give Vendura the molds, Watermark filed suit in this Court, along with an "Application for Mandatory Injunction" (Docket Entry No. 3) which sought a return of the molds Watermark had sent to Sta-Care, along with other items. Sta-Care did not object to the return

2

of the items, but only contested the amount of the bond to be imposed. After a hearing, the Court ordered the return of certain specified molds upon the posting of a $37,889.64 bond. Subsequently, Watermark filed a "Motion to Add Property to Injunction" (Docket Entry No. 18). After an evidentiary hearing, that Motion was denied because the mold sought to be added was not within the scope of the original application for injunctive relief and because the evidence showed Sta-Care had purchased the mold from another vendor and Watermark had not presented evidence it had paid for the mold. (Docket Entry No. 49).

In Watermark's First Amended Complaint, Sta-Care is alleged to have violated the "joint venture agreement" which governed the relationship between the parties. While the parties did not enter into a document entitled a "joint venture agreement," Watermark references three agreements in its First Amended Complaint which set forth the business relationship between the parties, including an original production agreement, a cost plus production agreement, and a Confidential Disclosure Agreement.[1] As a result of the alleged breaches of the joint venture agreement, Watermark, in its First Amended Complaint, sues Sta-Care for breach of bailment, conversion, breach of contract, failure to honor warranties, interference with contractual relationships, violation of the Tennessee Consumer Protection Act, copyright infringement, violation of the Lanham Act, unfair competition, breach of fiduciary duty, violation of the Tennessee Trade Secrets Act, and unjust enrichment. Watermark also asks for an accounting of "its payments, costs of goods, and other costs and expenses arising from [the parties'] contractual relationship." Id. at ¶65.

Sta-Care believes that most of the witnesses and evidence related to Watermark's claims are located in Wisconsin and the vast majority of the events at issue took place in Wisconsin. Therefore,

---

[1] Apart from the Confidential Disclosure Agreement, it is not clear if either of the other two agreements were reduced to writing, either in whole or in part.

3

Sta-Care argues this action should be transferred to Wisconsin. In support of its Motion to Transfer Venue, Sta-Care has submitted the Declaration of Travis Aldridge ("Aldridge"), the Executive Vice President of Sta-Care.[2]

In his Declaration, Aldridge states that Sta-Care's business activities, including design, manufacturing, sales, and administrative activities, are conducted primarily from Sta-Care's headquarters in Portage, Wisconsin, although it does have manufacturing plants in Pardeeville, Wisconsin and Pana, Illinois. (Aldridge Decl. at ¶ 2). Aldridge states that from August of 2006 to October of 2007, Watermark maintained an office within the Sta-Care facilities in Portage, Wisconsin and Pardeeville, Wisconsin. (Id. at ¶ 4). During this time, some of Watermark's corporate functions were actually conducted by Sta-Care employees and Watermark maintained a dedicated 800-number telephone line for its customers that rang into the switchboards at Sta-Care's facility in Portage, Wisconsin. (Id.). While Watermark no longer maintains the office in Sta-Care's facility, Aldridge states that Watermark's Vice President, Tim O'Neil ("O'Neil"), lives and works in Madison, Wisconsin. (Id. ¶ 5).

With regard to the parties' business relationship and the governing agreements, Aldridge states that the original production agreement was negotiated in Wisconsin and by long-distance communication. (Id. at ¶ 8). Aldridge also claims the cost plus production agreement was first raised during a meeting in Nashville, Tennessee, but the terms of the agreement were negotiated and agreed to primarily during two meetings in Wisconsin and a telephone conference. (Id.). In fact, during a meeting held in Wisconsin in August 2006, the terms of that agreement were presented,

---

[2]Watermark argues that the Court should not consider Aldridge's Declaration because it is not signed before a notary public. However, Aldridge makes his statement in the Declaration under the penalties of perjury and hence the Court may consider it as if it had been a duly notarized affidavit pursuant to 28 U.S.C. § 1746.

discussed, and agreed to in principle by Steven Elmore ("Elmore") and Mike Broach ("Broach") of Watermark, and Steven Aldridge and Travis Aldridge (the President of Sta-Care), and it was after this meeting that Watermark began performing corporate functions out of Sta-Care facilities in Wisconsin. Further details of the joint venture were negotiated in Wisconsin in November of 2006, when Elmore and Broach again met with Sta-Care representatives in Wisconsin.

In his Declaration, Aldridge identifies witnesses who could be called by Sta-Care to rebut the various claims by Watermark. To some extent, the witnesses overlap.

Aldridge identifies thirteen Sta-Care employees who could testify on the issues of whether Sta-Care acted in bad faith and breached its contractual responsibilities by shipping the wrong product to Watermark customers, failing to communicate production schedules accurately or timely, failing to refund overpayments, misapplying payments, and unlawfully withholding shipments. All of those witnesses live and work in Wisconsin. Aldridge also identifies nine Wisconsin Sta-Care employees who might be called to testify on whether Sta-Care breached the joint venture agreement by declining to produce the "wet room" product because it was determined that the project was not feasible given Sta-Care's manufacturing facilities. Aldridge further identifies six Sta-Care employees and one former Sta-Care employee who are Wisconsin residents who could be witnesses relating to any accounting which would be conducted. Aldridge identifies seven Wisconsin residents consisting of four Sta-Care employees, one Programming Plus, Inc. employee, and two Custom Fiberglass employees who were most directly involved in designing, building and testing of molds for Watermark and who are possible witnesses on the issues relating to creation and manufacture of the molds at issue.

Aldridge also states in his Declaration that after Watermark provided Sta-Care with the 51 molds from Mexico, Watermark then provided specifications to Sta-Care for the production of other

5

products which could not be made by those molds. Sta-Care expended considerable time and resources designing master molds and the AutoCad modeling for the new molds was performed under Sta-Care's direction by Lyle Brummer, of Programming Plus, Inc., in Milwaukee, Wisconsin. The molds were actually built by Custom Fiberglass, Inc., in Weyauwega, Wisconsin. (Aldridge Decl. ¶ 19).

Aldridge further claims in his Declaration that Watermark violated the terms of the Confidential Disclosure Agreement when it provided confidential information from Sta-Care to Vendura concerning molds and plans for manufacturing the wet room floor pans. Vendura has possession of the master molds and the molds that were the subject of the Court's prior injunction Order. Vendura is located in Madison Wisconsin.

In opposition to the Motion to Transfer Venue, Watermark submits the affidavit of its President, Steve Elmore. In his Affidavit, Elmore claims "[t]hat many of the business functions in the 'joint venture' with Sta-Care occurred in Nashville, Tennessee which is the headquarters of Watermark Solid Surface, Inc. such as sales, marketing, strategy, accounting and product storage." (Elmore Aff. ¶ 4). Elmore also states that Travis and Steve Aldridge proposed the joint venture to him in Nashville. (Id. ¶ 10). Elmore claims that Watermark has no customers in Wisconsin and that its largest customer is in Nashville. (Id. ¶ 8).

Elmore also states that "there are multiple witnesses here in Nashville that will be necessary in the trial of this matter such as me, Kim Noles, Mike Broach, Jeff Trzewski, and Amy Arnold." (Id. ¶ 5). Elmore also claims that while O'Neil works for Watermark in Wisconsin, he is willing to travel to Nashville to testify. (Id.) As for the potential witnesses identified by Sta-Care, Elmore claims that "most" are "cumulative and or unnecessary" and that most of the testimony those witnesses would offer could be presented by one or both Aldridges. Finally, Elmore states that the

6

800 telephone number identified by Aldridge "now rings into Watermark's Tennessee offices." (Id. ¶ 7).

## II. **APPLICABLE LAW AND ANALYSIS**

Sta-Care seeks a change of venue to the Western District of Wisconsin under 28 U.S.C. § 1404(a). This statute permits the Court to transfer the case to a district in which it might have been brought if it is necessary for the convenience of the parties and witnesses or in the interests of justice. Blane v. American Inventors Corp., 934 F.Supp. 903, 907 (M.D. Tenn. 1996). This action could have been brought in the Western District of Wisconsin pursuant to 28 U.S.C. §§ 1391(b) & (c) because Sta-Care is a corporation with its principal place of business in Portage, Wisconsin and a substantial number of the events giving rise to the litigation occurred in that district. The question thus becomes whether the case should be transferred for the convenience of the parties and witnesses and in the interest of justice.

The burden is on Sta-Care as the moving party to establish that the case should be transferred. Id. Watermark's choice of forum should not be disturbed unless the balance is strongly in favor of Sta-Care. Id. (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)).

"In ruling on a motion to transfer under § 1404(a), a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" Moses v. Business Card Express, Inc., 929 F.2d 1131, 1137 (6th Cir.1991), citing Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 30, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988). In making the determination of whether to transfer a case under Section 1404(a), "courts have considered the following factors: (1) the location of willing and unwilling witnesses, (2) the

7

residence of the parties, (3) the location of sources of proof, and (4) the location of the events that gave rise to the dispute." Blane, 934 F.Supp. at 907.[3]

A district court has broad discretion under section 1404(a) in determining whether to transfer a case. Analysis of the applicable factors leads this Court to conclude that the balance tips strongly in favor of transferring this case to the Western District of Wisconsin and accordingly the Court will exercise its discretion and transfer the case to that district.

**A. The Location of Willing and Unwilling Witnesses**

"The most significant factor when considering a transfer under § 1404 is the convenience of the witnesses." Returns Distrib. Specialists, LLC v. Playtex Prods., Inc. 2003 WL 21244142 at *7 (W.D. Tenn. 2003)(collecting cases). Further, in considering the convenience of the witnesses, the convenience of the non-party witnesses is paramount. Sitrick v. Dreamworks, LLC., 2003 21147898 at *3 (N.D. Ill. 2003).

According to the evidence which has been submitted, the overwhelming majority of the likely witnesses in this case, including both party-controlled and non party-controlled witnesses, are located in Wisconsin. Seventeen of the 18 current Sta-Care employees who might testify live in Wisconsin, as does the lawyer who drafted the Confidential Disclosure Agreement. Watermark has identified four potential party-controlled witnesses who reside in Nashville, Tennessee, but even its own Vice President resides and works in Wisconsin. As for non-party witnesses, Watermark has identified one former employee who resides in Tennessee and is likely to testify.[4] In contrast, Sta-

---

[3]While a court should also consider the "public-interest concerns, such as systemic integrity and fairness, which comes under the rubric 'interest of justice,'" Moses, 929 F.2d at 1137, where relevant, the Court finds no systemic integrity or other public interest concerns at issue in this case in relation to the transfer question.

[4]This witness is Jeff Trzewski who was formerly employed by Watermark. He testified at the preliminary injunction hearing and hence it can be assumed that he is a cooperative witness as

8

Care has identified several non party-controlled witnesses who reside in Wisconsin. Those witnesses would include employees of Vendura, Sta-Care's competitor, which now manufactures products for Watermark and has possession of the molds. Additionally, Sta-Care has identified three non-party witnesses involved in the design and construction of the disputed molds who are located in Wisconsin, including those who did the AutoCad modeling and those involved in building the mold masters. Further, Sta-Care identifies as a probable witness a former employee who resides in Wisconsin and who was involved in the purchasing of special items needed in the joint venture.

The Court notes that Watermark, through Elmore's Affidavit, asserts that "most" of the witnesses identified by Sta-Care are cumulative or unnecessary. However, Watermark does not identify the unnecessary witness or explain the basis for its assertion that "most" of the witnesses identified by Sta-Care are cumulative or unnecessary other than to claim, without any support, that the Aldridges could provide most of the required testimony in this case. Further, Watermark's assertions do not address the third-party witnesses identified by Sta-Care. Accordingly, the Court finds the convenience of the witnesses factor weighs heavily in favor of transfer.

### B. The Residence of the Parties

At first glance, the residence of the parties factor favors neither Watermark nor Sta-Care in terms of venue since Watermark has its principal place of business in Tennessee and Sta-Care has its principal place of business in Wisconsin. However, as Sta-Care points out, Watermark is no stranger to Wisconsin and its Vice President lives and works in Madison, Wisconsin. In fact, for a period of time, according to Watermark's First Amended Complaint, Watermark's corporate functions were divided between Watermark's Nashville office and Sta Care's facilities in Wisconsin. Further, the manufacturer Watermark currently uses is located in Wisconsin, as are the disputed

---

far as Watermark is concerned.

molds which are at the center of this litigation. Thus, this factor, too, favors transfer of the action to Wisconsin.

### C. The Location of Sources of Proof

Sta-Care asserts that given the scope of Watermark's Complaint, and considering its request for a full accounting of all costs and expenses related to the parties' contractual relationship, it is obvious that the bulk of the evidentiary proof will be located in Wisconsin. Sta-Care also claims that the vast majority of information related to the requested accounting alone is voluminous and difficult to duplicate, and includes computerized information that is part of a proprietary software system that handles Sta-Care's solid surface order processing, invoicing system, project management system, and accounts receivable information. This computer system, the related computerized information, and the people who know how to operate the system are located in Wisconsin.

In response, Watermark argues that Sta-Care's discussion of the location of the relevant sources of proof in this matter, and in particular Sta-Care's discussion of its computer system, is a "red herring" inasmuch as Sta-Care would not be expected "to actually produce the computer system itself in Court in Nashville." (Docket Entry No. 42 at 3). Watermark also observes that "[i]n the modern era of photocopying, scanning, fax machines, e-mail, overnight delivery services, etc., the location of documents should be considered a neutral factor when deciding to transfer venue under § 1404(a). Walker v. Jon Renau Collection, Inc., 423 F.Supp.2d 115, 118 n.3 (S.D.N.Y. 2005)." (Id. at 4).

Were documents and computer records the only expected proof in this case, the Court would be inclined to find this to be a neutral factor in the transfer analysis. However, Watermark claims to have designed more than 75 unique molds which Sta-Care challenges. Watermark also claims that Sta-Care is selling or has sold products made from Watermark designed molds. Clearly, the

10

molds and the physical products made from the molds will be important to discovery and the trial of this matter. In fact, during the evidentiary hearing on Watermark's Motion to Add Property to Injunction, Watermark brought two shower bases to the hearing to support its claim that a certain mold was not returned. Those shower bases were 36" x 36." While the shower bases themselves were not introduced into evidence, the cutouts measuring approximately 12" x 12" were introduced into evidence and were heavy given their size. Some of the molds measure up to 96" x 96," and the Court understands that many of the molds and the products produced by them are large, cumbersome and heavy. The disputed molds are now located at Vendura in Madison, Wisconsin and transportation to a federal courthouse in the Western District of Wisconsin will be much easier than transporting the molds here and a site visit, if warranted, would be easier in Wisconsin. Thus, this factor weighs in favor of transfer.

### D. The Location of the Events Giving Rise to the Dispute

In opposing the Motion to Transfer Venue, Watermark conclusorily asserts that while negotiations of the contracts between the parties occurred in both Tennessee and Wisconsin, "many of the business functions necessary in Watermark's joint venture with Sta-Care occurred in Nashville, including sales, marketing strategy planning, accounting and product storage." (Docket Entry No. 42 at 5). Although that may be true in an abstract sense, this Court is concerned with the events giving rise to this dispute as reflected in the allegations brought by Watermark against Sta-Care. Viewed in this perspective, it is clear that the weight of the events which precipitated this dispute occurred in Wisconsin.

While Sta-Care's top executives traveled to Nashville, Tennessee on two separate occasions to discuss the party's evolving agreement and may have actually pitched the idea for a joint venture agreement during one of those visits, the majority of the negotiations relating to the contracts

11

occurred either by phone or in Wisconsin. In fact, Elmore signed the Confidential Disclosure Agreement in Wisconsin and that document indicates the Agreement was made in Wisconsin and was to be construed under the laws of the State of Wisconsin.

Further, Sta-Care's performance of the "joint venture agreement" between the parties occurred in Wisconsin. It was there it took possession of the Mexican molds, designed and created other molds, stored the molds, and made products for Watermark from those molds. Additionally, Sta-Care's administration of Watermark's business took place in Wisconsin and, at least for a time, Watermark actually had offices at Sta-Care's facilities in Wisconsin. After Watermark filed suit and requested an injunction seeking the return of the molds in Sta-Care's possessions, those molds (presumably at Watermark's request) were delivered to Vendura in Madison, Wisconsin. The location of the events giving rise to this dispute clearly favors a transfer of this case to Wisconsin.

### III. CONCLUSION

Section 1404(a) of Title 28 provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Based on the foregoing analysis, the Court concludes that it is in the interest of justice and substantially more convenient for the parties and witnesses to litigate this case in Wisconsin. Accordingly, Sta-Care's "Motion to Transfer Venue" will be granted and this case will be transferred to the United States District Court for the Western District of Wisconsin.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE